# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

UNITED STATES OF AMERICA,     :

                                    :

v.                                 :

                                   :     CASE NO.: 1:13-CR-12 (WLS)

STEWART PARNELL,            :

MICHAEL PARNELL, and     :

MARY WILKERSON,          :

                                   :

     Defendants.             :

_____:

## ORDER

Pending before the Court are Defendant Stewart Parnell's Motion for Judgment of Acquittal, Motion for Dismissal or, in the Alternative, Motion for New Trial (Doc. 326), Defendant Michael Parnell's Motion for Judgment of Acquittal, as amended (Docs. 313 & 353), Defendant Mary Wilkerson's Motion for Judgment of Acquittal, as amended (Docs. 306, 325 & 382), Defendant Mary Wilkerson's Motion for New Trial (Docs. 339), Defendant Mary Wilkerson's Motion to Dismiss the Indictment on Count 73 or, in the Alternative, Motion for a New Trial (Doc. 387), Defendant Mary Wilkerson's Motion for Authorization for Payment (Doc. 396), and the Defendants' Joint Motion for New Trial, as amended (Docs. 308, 319, 328, 350, 353 & 362).  For the reasons that follow, those Motions, as amended (*See* Docs. 306, 308, 313, 319, 325, 326, 328, 339, 350, 353, 362, 382, 387 & 396) are **DENIED.**

## I.    Motions for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, a defendant's motion for judgment of acquittal should be granted if the Court finds that "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Thus, the Court "must determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (citing *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999)).  The conviction must be upheld unless the Court finds that "the jury could not have found the defendant guilty under any reasonable construction of the evidence."

*United States v. Jimenez*, 705 F.3d 1305, 1308 (11th Cir. 2013) (citing *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008)).

In construing the evidence, the Court must take the evidence in the light most favorable to the Government. *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing *United States v. Futrell*, 209 F.3d 1286, 1288 (11th Cir. 2000)). Accordingly, the Court must "resolve any conflicts in favor of the Government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict." *Id.* (citing *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) and *Ward*, 197 F.3d at 1079). "The prosecution need not rebut all reasonable hypotheses other than guilt." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (citing *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982)). Thus, "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *Thompson*, 473 F.3d at 1142 (citing *United States v. Mieres-Borges*, 919 F.2d 652, 656 (11th Cir. 1990)). If, as it did here, the Court reserves decision on the motion made at the close of the Government's evidence, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

In this case, the Indictment charged Defendants Stewart and Michael Parnell with Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349 i/c/w 18 U.S.C. §§ 1341 & 1343, Conspiracy to Introduce and Deliver for Introduction into Interstate Commerce with Intent to Defraud or Mislead Adulterated and Misbranded Food in violation of 18 U.S.C. § 371 i/c/w 21 U.S.C. §§ 331(a) & 333(a)(2), Introduction of Adulterated and Misbranded Food into Interstate Commerce with Intent to Defraud or Mislead in violation of 21 U.S.C. §§ 331(a) & 333(a)(2), Mail Fraud in violation of 18 U.S.C. § 1341, and Wire Fraud in violation of 18 U.S.C. § 1343. (*See* Doc. 1 at 14-15, 23, 40-48.) Also, the Indictment charged Stewart Parnell and Defendant Mary Wilkerson with obstruction of justice in violation of 18 U.S.C. § 1505. (*See id.* at 49-50.)

"To sustain [a] conspiracy conviction under 18 U.S.C. § 1349, the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) (citing *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013)). The Indictment

alleged that the substantive offenses underlying the § 1349 conspiracy charge were mail and wire fraud.  (*See* Doc. 1 at 14.)  "Aside from the means by which a fraud is effectuated, the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical." *United States v. Ward*, 486 F.3d 1212, 1221-22 (11th Cir. 2012) (citing *Beck v. Prupis*, 162 F.3d 1090, 1095 & n.9 (11th Cir. 1998)).  "Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or causes the use of the mails or wires for the purpose of executing the scheme or artifice."  *Id.* at 1222 (citing *United States v. Hewes*, 729 F.2d 1302, 1320 (11th Cir. 1984), and *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003)).  "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence."  *Hasson*, 333 F.3d at 1270-71 (citations omitted).  "Proof of specific intent to use the mails or wire[s] is not required to show conspiracy to commit mail or wire fraud[, only that the defendants] agreed to engage in a scheme to defraud in which they contemplated that the mails [or wires] would likely be used."  *United States v. Ross*, 131 F.3d 970, 981 (11th Cir. 1997) (citing *United States v. Massey*, 827 F.2d 995, 1001-02 (5th Cir. 1987)).

"The elements of a conspiracy under 18 U.S.C. § 371 are (1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *Hasson*, 333 F.3d at 1270 (citing *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998)).  The Indictment alleged that violations of 21 U.S.C. §§ 331(a) and 333(a)(2) are the substantive offenses underlying the § 371 conspiracy charge.  (Doc. 1 at 23.)  Under Title 21, United States Code, Sections 331(a) and 333(a)(2), it is illegal to "introduc[e] or deliver[ ] for introduction into interstate commerce . . . any food . . . that is adulterated or misbranded" "with the intent to defraud or mislead."  A food is adulterated "[i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health."  21 U.S.C. § 342(a)(1).  A food is misbranded if "its labeling is false or misleading in any particular."  *Id.* § 343(a)(1).

The elements of obstruction of justice under 18 U.S.C. § 1505 are (1) a proceeding was pending before a department or agency of the United States; (2) the defendant was aware of the pending proceeding; and (3) the defendant "intentionally endeavored corruptly

to influence, obstruct or impede the pending proceeding." *United States v. Price*, 951 F.2d 1028, 1031 (9th Cir. 1991) (citations omitted). "The term 'corruptly' means 'acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.' " *United States v. Taohim*, 529 F. App'x 969, 972 (11th Cir. 2013) (citing 18 U.S.C. § 1515(b)).

### A.    Stewart Parnell's Motion for Judgment of Acquittal

Stewart Parnell was indicted on one count of conspiracy in violation of 18 U.S.C. § 1349 i/c/w 18 U.S.C. §§ 1341 & 1343, one count of conspiracy in violation of 18 U.S.C. § 371 i/c/w 21 U.S.C. §§ 331(a) & 333(a)(2), twenty counts of introduction of adulterated food into interstate commerce with intent to defraud or mislead in violation of 21 U.S.C. §§ 331(a) & 333(a)(2), thirteen counts of introduction of misbranded food into interstate commerce with intent to defraud or mislead in violation of 21 U.S.C. §§ 331(a) & 333(a)(2), twenty counts of mail fraud in violation of 18 U.S.C. § 1341, eleven counts of wire fraud in violation of 18 U.S.C. § 1343, and two counts of obstruction of justice in violation of 18 U.S.C. § 1505. (*See* Doc. 1.) More simply, Stewart Parnell was indicted for mail fraud and wire fraud, conspiracy to commit those crimes under § 1349; introduction of adulterated and misbranded food into interstate commerce with intent to defraud or mislead, and conspiracy to commit those crimes under § 371; and obstruction of justice. Stewart Parnell was convicted by jury on all counts as alleged in the Indictment. (*See* Doc. 285.)

Stewart Parnell contends that the evidence introduced against him at trial was insufficient to sustain a conviction for any charge. (Doc. 326 at 1.) Stewart Parnell argues that the evidence demonstrated that "he had a good faith belief that retesting was a legitimate process and he believed the Operation Manager at the Blakely[, Georgia,] plant was properly following protocol." (*Id.*) Stewart Parnell states that "[t]he only direct evidence of [his] participation in any criminal activity was Mr. Kilgore's testimony regarding [his] knowledge of the Kellogg's scheme." (*Id.*) According to Stewart Parnell, because Kilgore's testimony "was impeached through cross-examination," such testimony "should be ignored." (*Id.* at 1-2.)

As stated above, the Court must "resolve any conflicts in favor of the Government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict." *Maxwell*, 579 F.3d at 1299.

4

The question confronting the Court is not whether the evidence introduced at trial would have supported an acquittal. *Thompson*, 473 F.3d at 1142. The Court finds that the evidence at trial amply supports Stewart Parnell's conviction for the § 1349 conspiracy charge. Samuel Lightsey and Daniel Kilgore testified as to Stewart Parnell's participation with other individuals to falsify and mail COAs to customers in other states for the purpose of creating the belief in those persons that the information contained in those COAs was truthful. Stewart Parnell also participated with others to ship peanut products to customers in other states while contemporaneously making misrepresentations calculated to ensure those persons had no knowledge that the peanut products were not tested for salmonella, had tested positive for salmonella, or were otherwise not what they purported to be. Numerous emails were introduced at trial that served as evidence that Stewart Parnell provided customers with peanut products not allowed by Peanut Corporation of America's ("PCA") contracts. For instance, one email from Stewart Parnell indicated that he purchased Mexican peanut paste, relabeled the paste to lead customers to falsely believe the paste was made at the PCA facility in Blakely, and shipped the paste to those customers. Because Stewart Parnell knowingly, intentionally, and personally participated in and caused others to participate in those activities, the Court also finds that the evidence supports Stewart Parnell's convictions for the substantive offenses of mail and wire fraud.

Next, the Court finds that the evidence introduced at trial supports Stewart Parnell's conviction for the § 371 conspiracy charge. Lightsey and Kilgore testified that Stewart Parnell personally participated in-person and via email with other persons to ship peanut products contaminated with salmonella and stored in insanitary conditions from the PCA facility in Blakely to customers throughout the United States. Stewart Parnell and other conspirators would ship peanut products before receiving salmonella test results, or after receiving positive test results for salmonella, and would falsify documentation purportedly from a laboratory for the purpose of falsely indicating to customers that the test results for salmonella were negative. In addition to the referenced testimony, the Government introduced a large volume of email communications to and from Stewart Parnell that indicated his personal participation in the above-described conspiracy. Specifically, many emails sent from Stewart Parnell directed other individuals to ship products he knew to be contaminated with salmonella or knew to have been stored in insanitary conditions. Because Stewart Parnell know-

ingly, intentionally, and personally participated in and caused others to participate in those activities, the Court finds that the evidence supports Stewart Parnell's convictions for the substantive offenses of introduction of misbranded and adulterated food into interstate commerce with the intent to defraud or mislead.

The Court notes that Stewart Parnell did not challenge the sufficiency of the evidence supporting his convictions for obstruction of justice.  Nonetheless, the Court finds that the evidence at trial amply supports Stewart Parnell's convictions for obstruction of justice.  At trial, Janet Gray testified, and several audio recordings demonstrated, that Stewart Parnell told FDA investigators that he had no knowledge of positive test results for salmonella on any peanut products produced at the PCA Blakely facility.  Emails introduced at trial demonstrated that, at the time the referenced statements were made, Stewart Parnell had knowledge that numerous lots of peanut paste tested positive or presumptively positive for salmonella.

For the reasons stated above, the Court finds that sufficient evidence, as the record stood at the conclusion of the Government's case, supports Stewart Parnell's convictions. As such, Stewart Parnell's Motion for Judgment of Acquittal (Doc. 326) is **DENIED.**

## B.        Michael Parnell's Motion for Judgment of Acquittal

Michael Parnell was indicted on one count of conspiracy in violation of 18 U.S.C. § 1349 i/c/w 18 U.S.C. §§ 1341 & 1343, one count of conspiracy in violation of 18 U.S.C. § 371 i/c/w 21 U.S.C. §§ 331(a) & 333(a)(2), twelve counts of introduction of adulterated food into interstate commerce with intent to defraud or mislead in violation of 21 U.S.C. §§ 331(a) & 333(a)(2), twelve counts of introduction of misbranded food into interstate commerce with intent to defraud or mislead in violation of 21 U.S.C. §§ 331(a) & 333(a)(2), twelve counts of mail fraud in violation of 18 U.S.C. § 1341, and five counts of wire fraud in violation of 18 U.S.C. § 1343.  (*See* Doc. 1.)  More simply, Michael Parnell was indicted for mail fraud and wire fraud, conspiracy to commit those crimes under § 1349; and introduction of adulterated and misbranded food into interstate commerce with intent to defraud or mislead, and conspiracy to commit those crimes under § 371.  Michael Parnell was convicted on all counts except introduction of adulterated food into interstate commerce with intent to defraud or mislead.  (*See* Doc. 285.)

Michael Parnell now argues that he is entitled to judgment of acquittal because the evidence was insufficient to establish that he "knew of or intended to ship misbranded food or participated in a conspiracy or fraudulent scheme to do so." (Doc. 313 at 2.)  Also, Michael Parnell asserts that the verdict is inconsistent because the jury found him guilty of shipping misbranded food, but not guilty of shipping adulterated food.  (*Id.*)

The Court finds that the evidence at trial amply supports Michael Parnell's convictions for the § 1349 conspiracy charge described above.  Kilgore testified that Michael Parnell participated in a meeting whereby a decision was made to use negative test results obtained on certain lots of peanut paste and use those results for subsequent lots that tested positive for salmonella or were not tested at all.  Kilgore also testified that Michael Parnell would personally falsify COAs and send them to Kellogg's for the purpose of creating the false belief in employees of Kellogg's that the products they were receiving from PCA were confirmed to be free of salmonella.  Lightsey testified that he informed Michael Parnell of the referenced scheme and Michael Parnell admitted his knowledge of the scheme.  At that time, Michael Parnell told Lightsey that he would ensure that Kellogg's did not discover the scheme.  Several individuals testified that Michael Parnell was intimately involved with the operation of PCA, the production of peanut paste, the falsification of COAs, and making representations to customers, especially Kellogg's, regarding the production and testing processes of peanut paste.  Further, the Government introduced numerous emails from and to Michael Parnell that indicated his knowledge of the referenced scheme, and his intent to hide the purpose of the scheme from PCA's customers.  Because Michael Parnell knowingly, intentionally, and personally participated in and caused others to participate in, those activities the Court also finds that the evidence supports Michael Parnell's convictions for the substantive offenses of mail and wire fraud.

Next, the Court finds that the evidence introduced at trial supports Michael Parnell's conviction for the § 371 conspiracy charge described above.  Michael Parnell stated to customers that the peanut paste was free of salmonella and that such was confirmed by laboratory testing.  Many emails introduced at trial indicate Michael Parnell's knowledge that some peanut products he shipped or caused to be shipped had not been tested for salmonella. The COAs Michael Parnell created and shipped indicated otherwise.  Because Michael Parnell knowingly, intentionally, and personally participated in, and caused others to participate

in, those activities, the Court also finds that the evidence supports Michael Parnell's convictions for the substantive offense of introduction of misbranded food into interstate commerce with the intent to defraud or mislead.

The Court notes that Michael Parnell cannot challenge his convictions based on an allegedly inconsistent verdict. *See United States v. Powell*, 469 U.S. 57, 58-59, 69 (1984). Further, if the Court could consider whether the findings made by the jury were consistent, the Court could nonetheless conclude that the jury's verdict was consistent. The jury acquitted Michael Parnell on all counts involving adulterated food, but convicted him on all counts involving misbranded food. The evidence at trial indicated that Michael Parnell was much more involved with falsifying COAs than directing individuals to ship products he knew to be contaminated with salmonella. As such, the jury could have concluded that Michael Parnell was not guilty of activities involving adulterated food, but was guilty of activities involving misbranded food. In other words, the jury's verdict conceivably rested upon factual findings, not upon a mistaken understanding of the law.

For the reasons stated above, the Court finds that sufficient evidence, as the record stood at the conclusion of the Government's case, supports Michael Parnell's convictions. As such, Michael Parnell's Motion for Judgment of Acquittal (Doc. 313) is **DENIED.**

### C.        Wilkerson's Motion for Judgment of Acquittal

Although Wilkerson was indicted on two counts of obstruction of justice in violation of Title 18, United States Code, Section 1505, she was convicted of only one charge, Count 73. (*See* Doc. 285 at 57.) Count 73, as alleged in the Indictment, charged as follows:

> After S. Parnell told the inspector that if any samples had come up positive, Wilkerson would know, but he has no knowledge of any, the FDA Inspector asked Wilkerson if she has any knowledge of any positives. Wilkerson said to the FDA Inspector that earlier in the year she was not working in QA and that she was not aware of any positives.

(Doc. 1 at 50.) The crime of obstruction of justice is committed by any person

> [w]hoever corruptly . . . obstructs, or impedes . . . the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States.

18 U.S.C. § 1505. Wilkerson asserts that she is entitled to judgment of acquittal because the evidence against her as to obstruction was insufficient and the Indictment was "flawed." (*See*

Docs. 306 & 325 at 2-4.)  Also, Wilkerson argues that she is entitled to such relief because FDA Inspector Janet Gray did not document or record her interview or interrogation of Wilkerson.  (Doc. 306 at 3.)

According to Gray's testimony at trial, while conducting an investigation of a salmonella outbreak believed to be associated with peanut butter originating from the PCA Blakely facility, Stewart Parnell told her that Wilkerson would know if any presumptive positive test results for salmonella were generated for peanut products produced by the referenced facility.  Gray testified that when asked in January 2009, Wilkerson told her that she was unaware of any presumptive positive results for salmonella.  However, in an email sent by Wilkerson in June 2008, introduced into evidence as Exhibit 40-01, Wilkerson stated that "we have a problem with . . . salmonella at least every other week."  In another email sent by Wilkerson to Stewart Parnell, Wilkerson stated that a particular lot of peanut product was presumptively positive for salmonella.

The Court finds that the referenced evidence construed in the light most favorable to the Government is sufficient to support a reasonable jury's finding of Wilkerson's guilt as to obstruction of justice in violation of 18 U.S.C. § 1505.  A reasonable jury, assuming it believed Gray's testimony, could have believed that, at the time Gray asked about presumptive positive test results for salmonella, Wilkerson knew about such results and hid such knowledge from Gray for the purpose of impeding or obstructing the FDA's investigation of the salmonella outbreak.

The Court notes that all challenges to the Indictment should have been raised before trial.  Fed. R. Crim. P. 12(b)(3)(B).  As such, Wilkerson waived challenges to the Indictment by failing to raise such in a pretrial motion.  *See United States v. Ramirez,* 324 F.3d 1225, 1227-28 (11th Cir. 2003) (citing *United States v. Suescun,* 237 F.3d 1284, 1286-88 (11th Cir. 2001)).  Further, Wilkerson has failed to cite any case that suggests that a law enforcement officer or other government agent is required to document or record interviews or interrogations in the circumstances presented by this case.  On cross-examination, Wilkerson questioned Gray about her failure to document or record the interview.  Notwithstanding that line of questioning, the jury convicted Wilkerson.  On a motion for judgment of acquittal, the Court must assume that the jury believed all testimony favorable to the Government.  As such, the Court cannot conclude that the jury did not believe Gray's testimony solely because she did

not document or record her interview of Wilkerson.  Accordingly, Defendant Mary Wilkerson's Motion for Judgment of Acquittal, as amended (Docs. 306 & 325) is **DENIED.**

## II.        Motions for New Trial

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).

### A.        Business Records Exception and the Emails

First, the Defendants argue that they are entitled to a new trial because "[t]he vast majority of the incriminating documents introduced by the government consisted of emails that were introduced through persons who had absolutely no connection to the substance or content of the electronic transmissions."  (*See* Doc. 326 at 3.)  The Defendants do not provide a specific example of an instance where the Court permitted the introduction of an email that allegedly ran afoul of the rules against hearsay.  (*See generally* Doc. 326.)  Nonetheless, the Court disagrees with the Defendants' contention that they are entitled to a new trial based on the referenced alleged evidentiary error.

"Hearsay" is any statement "the declarant does not make while testifying at the current trial or hearing . . . and a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is inadmissible unless permitted by the Federal Rules of Evidence or federal law.  Fed. R. Evid. 802.  The business records exception to the hearsay rule excludes the following from the general rule barring hearsay:

> A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) neither the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  Knowledge of the content of the business record is not necessary for admission under Rule 803(6).  "To be admitted under [that Rule,] 'the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness.' "  *United States v. Parker*, 749 F.2d 628, 633 (11th

Cir. 1984) (citing *Itel Cap. Corp. v. Cups Coal Co., Inc.*, 707 F.2d 1253, 1259 (11th Cir. 1983)). "The touchstone of admissibility under the business records exception is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." *United States v. Bueno-Sierra*, 99 F.3d 375, 378-79 (11th Cir. 1996) (citing *United States v. Veytia-Bravo*, 603 F.2d 1187, 1189 (5th Cir. 1979)).

Throughout the Defendants' trial, the Court permitted the Government to introduce emails during the testimony of Kilgore and Lightsey under the business records exception to the hearsay rule. Kilgore and Lightsey were not participants in many of those emails. Those individuals, however, were established by a preponderance of the evidence to be persons with personal knowledge that PCA employees regularly communicated via email and the content of the particular emails introduced into evidence were subjects routinely discussed by PCA employees in emails. Those persons testified about the individuals involved in the emails, provided uncontroverted testimony about the involved persons' knowledge of the content discussed in those emails, and provided information about the subject matter. None of the information provided in this regard was disputed by any other witness. In other words, the witnesses used to introduce the referenced emails laid all of the foundational requirements necessitated by Rule 803(6) and the totality of the circumstances indicate that the foundational testimony and content of the referenced emails were trustworthy.

Stewart Parnell primarily relies upon *United States v. Cone*, 714 F.3d 197 (4th Cir. 2013). In that case, the United States Court of Appeals for the Fourth Circuit held that a "district court's observation that the e-mails were kept as a 'regular operation of the business' is simply insufficient *on that basis alone* to establish a foundation for admission under Rule 803(6)(B)." *Id.* at 220 (emphasis supplied); *see also Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008) ("An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule."). The Court expressed a concern that emails may be too casual to expect the same degree of accuracy generally attendant to more traditional business records. *Id.* at 219-20 (quoting *It's My Party, Inc. v. Live Nation, Inc.*, Case No. JFM-09-547, 2012 WL 3655470, at *5 (D. Md. Aug. 23, 2012)). *Cone* also acknowledged, however, that "[a]s email is more commonly used to communicate business matters both internally and externally . . . more formal paper records are becoming more unusual." *Id.* (citation omitted).

11

The Court reads *Cone* as reinforcing the axiomatic notion that emails should not be treated any differently than any other business record for purposes of Rule 803(6). Just like all other business records, the mere fact that a business record was created for a business entity does not necessarily satisfy the requirements of Rule 803(6)(B) that "the record was kept in the course of a regularly conducted activity of a business" and Rule 803(6)(C) that "making the record was a regular practice of that activity." Although the witnesses used to introduce those emails did not necessarily have personal knowledge of the particular conversation or all subject matter contained therein, for the reasons stated above, the Court finds that the foundation provided by those witnesses was sufficient for admission under Rule 803(6). Further, the Court notes that the Defendants have not identified any specific email as improperly admitted under the referenced Rule. For that reason, the Court can only rule as to the general procedure used for admission of the emails. As to the Defendants' contention that they are entitled to a new trial because the Court improperly admitted emails as business records under Rule 803(6), the Motion (Doc. 326) is **DENIED.**

### B.  Allegedly Improper Comments by Prosecutor Hearn

The Defendants argue that they are entitled to a new trial because, during closing arguments, Prosecutor Patrick Hearn stated to the jury:

> The public people deserve and want safe food for their families, their friends, their grandparents, themselves. People need to know that they won't be put at risk by the food they eat, by individuals such as the defendants Michael Parnell and Stewart Parnell who will toss food safety to the wind . . . This needs to not happen again. Everyone wants safe food. This case can ensure, can help towards that goal of safe food.

(Docs. 326 at 2-3, 353 at 2 & 375.) "Appeals to the jury to act as the conscience of the community, unless calculated to inflame the jury, are not per se impermissible." *United States v. Kopituk*, 690 F.2d 1289, 1342-43 (11th Cir. 1982) (citations omitted). Prosecutors are "caution[ed against] employing arguments immaterial to the defendant's guilt or innocence, especially when they appear calculated to 'shift the emphasis from evidence to emotion.' " *United States v. Gainey*, 111 F.3d 834, 836 (11th Cir. 1997) (quoting *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990)). However, a new trial will be granted in such circumstance only where the comments were improper *and* prejudicial to the Defendants' substantial rights. *See United States v. Boyd*, 131 F.3d 951, 955 (11th Cir. 1997) (citing *United States v. Blakey*, 14 F.3d 1557,

1560 (11th Cir. 1994)); *United States v. Beasley*, 2 F.3d 1551, 1560 (11th Cir. 1993) (citing *United States v. Bascaro*, 742 F.2d 1335, 1354 (11th Cir. 1984)).

"A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) (citing *United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir. 1998)).  Because the Defendants "did not raise this objection at trial, [the Court] review[s] only for plain error 'that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial.'"  *United States v. Merrill*, 513 F.3d 1293, 1306-07 (11th Cir. 2008) (citing *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)).

The Court finds that Hearn's statements do not warrant a new trial.  Throughout the trial, the Court repeatedly reminded the jury that statements by counsel are not evidence and that the jury could base its verdict only on the evidence admitted by the Court.  *See Gainey*, 111 F.3d at 836 (denying new trial after prosecutor made inappropriate comments during closing argument because court instructed jury that counsel's statements are not evidence).  Also, as highlighted above, the evidence against the Defendants was overwhelming.  As such, even if Hearn's referenced statements were improper, the Court finds that such statements were harmless.  *See Eckhardt*, 466 F.3d at 947 ("When the record contains sufficient independent evidence of guilt, [a prosecutor's improper remarks are] harmless.").  The Defendants' Motion for New Trial on the ground that Prosecutor Patrick Hearn's closing argument was prejudicial (Docs. 326 & 353) is therefore **DENIED.**

### C.        Allegation of Juror Misconduct

On October 6, 2014, Defendants Stewart Parnell and Michael Parnell filed a motion alleging that juror misconduct prejudiced their right to a fair trial.  (Doc. 308.)  The Court immediately sealed the proceeding and all subsequent filings related to the referenced allegation.  (*See* Docs. 310-312.)  Defendants Stewart and Michael Parnell attached to their motion a sworn statement by Juror 34 stating that several jurors conducted their own research into the merits of the above-captioned case, the jury discussed nine deaths caused by PCA, and Juror 35 told Juror 34 during the jury selection process that Juror 35 believed that all Defendants were guilty because they caused nine deaths.  (*See* Doc. 314-1.)

On October 23, 2014, the Court held a hearing on the referenced allegations of misconduct. The Court decided to call only Juror 34 to elicit additional details. Juror 34, the Defendants, and their counsel were present at the hearing, which occurred in the Court's Chambers under seal. At that hearing, Juror 34 stated that Juror 35 told Juror 34 during jury selection that Juror 35 believed all Defendants were guilty because their actions resulted in the deaths of nine people. The Court reminded Juror 34 that all venire members were instructed to inform the Court if any person said anything about the case. Juror 34 indicated that Juror 34 remembered that instruction but admitted that Juror 34 did not do so. Juror 34 claimed that Juror 34 did not tell the Court of Juror 35's comments because Juror 34 did not understand the possibility to do so, was afraid to do so, and had never served on a jury before. (Doc. 348 at 42-44.) Juror 34 also alleged that several jurors, the identities of whom Juror 34 was unsure, stated that they did their own research over the course of the trial and discovered that the Defendants "killed nine people." (*Id.* at 45-46.)

When asked how this information came to any Defendant or their counsels' attention, Juror 34 recounted a personal encounter with Defendant Wilkerson after the conclusion of the case. Juror 34 stated that the encounter with Wilkerson was an emotional experience for Juror 34 because Juror 34 felt personally responsible for Wilkerson's conviction. Juror 34 asserted that Juror 34 brought the alleged juror misconduct to Wilkerson and counsel's attention because Juror 34 felt like Wilkerson was not treated fairly and that her case was prejudged by the other jurors.

On November 12, 2014, the Court held a second hearing with all jurors, including alternates, present. The Court followed the same general procedure with each juror and alternate, separately and individually outside the hearing of other jurors. All jurors and alternates were instructed not to share or discuss questions asked during the Court's investigation with any other person.[1] Also, the Court informed the Defendants of the questions the Court intended to ask jurors and alternates, and, after the Court asked each juror those questions, the Defendants were provided the opportunity to suggest additional questions that particular juror should be asked. The Court thereafter posed additional questions to the particular juror.

---

[1] By prior written order issued by the Court on October 7, 2014, and served on each juror and alternate juror by Deputy United States Marshals, the Court ordered all jurors not to discuss this case with any other person.

The general procedure the Court followed with each juror and alternate was as follows. First, the Court informed the jurors that the Court was conducting an investigation into an allegation of juror misconduct and any intentional false statements made were subject to perjury charges. Second, for the purpose of ensuring the particular juror understood the stage of the criminal proceedings being discussed, the Court separated the proceedings against the Defendants into three phases: (1) the jury selection phase when the entire venire was present; (2) the course of the trial before deliberations began; and (3) the jury's deliberations. Third, the Court reminded the jurors of the Court's instruction before jury selection began. That instruction as read before jury selection and to each juror during the Court's investigation into alleged jury misconduct is as follows:

> Jurors, as I have explained to you, this case is expected to be extended, including jury selection which will probably take all of today and possibly into tomorrow. It is very important that you closely follow and abide by all of my instructions. You are instructed that until you are excused you should not discuss this case or these proceedings with anyone, including other jurors and members of your family or allow any juror to discuss them with you. Any violation of this instruction is to be reported directly to me at your earliest opportunity without discussing it with anyone else. You need only tell one of the Court Officers that you need to communicate with me and I will speak to you directly.

> Each of you is further noticed and advised that a violation of this instruction can subject the violator to contempt and other sanctions by the Court. The purpose of this is to ensure that the case proceeds according to the law and rules of the Court so that each party, the Government and each Defendant, might have the benefit of the fair and impartial trial each is entitled to under our Constitution.

> You are also reminded and instructed that you shall not personally engage with Counsel, parties or members of their staff, nor they with you. Any violation, even if innocent or unintentional, shall be immediately made known to the Court.

(*See, e.g.*, Doc. 349 at 89-90.) The jurors, in the order they were interviewed by the Court, and their statements are summarized as follows:

- Juror 35: Juror 35 did not make any statement about the case to Juror 34 or any other person during the selection process, had no knowledge of deaths caused by the Defendants at any point during the course of the trial, and did not hear any juror make any comment concerning the Defendants causing

deaths.  Juror 35 did not hear any juror state that they conducted independent research.

- Juror 37:  Although Juror 37 heard venire jurors discussing the case and their beliefs that the Defendants were guilty and had killed nine people, none of the people making those comments were selected to serve on the jury.  Juror 37 told individuals making those comments that nothing had been proven.  Although Juror 37 was sitting next to Juror 35 during jury selection, Juror 37 did not hear Juror 35 say anything about Juror 35's belief as to the guilt of the Defendants during the jury selection process. Juror 37 did not hear any person state that they did independent research into the facts of the above-captioned case.

- Juror 4:  Juror 4 did not hear any juror state that they believed the Defendants to be guilty before deliberations began and did not hear any juror state that they did independent research.  However, Juror 4 did hear an unknown juror state that the salmonella outbreak involved in this case caused deaths.

- Juror 10:  Juror 10 did not hear any person selected to serve on the jury state that they believed the Defendants to be guilty during the jury selection process but did hear at least one venire member state his or her belief that the Defendants were guilty before the deliberations began.  Juror 10 did not hear any juror state that they conducted independent research.

- Juror 12:  Juror 12 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  During deliberations, however, Juror 12 heard Juror 35 state Juror 35's belief that a large number of people died from the salmonella outbreak.  Other jurors corrected Juror 35 by informing that Juror that an expert testified that hundreds of people were *sickened* by the salmonella outbreak; there was no testimony that people died.  Juror 12 did not hear any juror state that they conducted independent research.

- Juror 40:[2]  Juror 40 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 40 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 42:  Juror 42 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 42 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 63:  Juror 63 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury

---

[2] The Court did not recall Jurors 34, 35 or 37 following subsequent questioning of the other jurors.

began deliberating.  Juror 63 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 84:  Juror 84 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 84 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.  Juror 84 reminded the Court, however, that Juror 84 informed the Court and the Parties during the jury selection phase that Juror 84 believed Juror 84 had heard that people had died from the salmonella outbreak but could set that knowledge aside and decide the case based only on the evidence presented in Court.

- Juror 89:  Juror 89 heard several jury venire members during the selection process state that they believed the Defendants were guilty but did not hear any juror who was selected to serve in this case make such statements before the jury's deliberations began.  Juror 89 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 93:  Juror 93 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 93 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 96:[3]  Juror 96 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 96 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 98:  Juror 98 heard several jury venire members state that they heard on television that nine people died as a result of the salmonella outbreak allegedly caused by the Defendants' actions.  Juror 98 did not hear any juror selected to serve in this case state their beliefs as to the guilt of the Defendants before deliberations began, state their knowledge as to whether any people had died due to the Defendants' actions, or state that they conducted independent research.

- Juror 111:[4]  Juror 111 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 111 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

---

[3] This juror and all subsequent jurors interviewed by the Court served as alternates.
[4] Juror 111 was excused for an illness on September 5, 2014.

- Juror 112:  Juror 112 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 112 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.  Juror 112 reminded the Court, however, that Juror 112 informed the Court and the Parties during the jury selection phase that Juror 112 believed Juror 112 had heard that nine people had died from the salmonella outbreak but could set that knowledge aside and decide the case based only on the evidence presented in Court.  Juror 112 had also informed the Court that his son worked with the Sheriff's Office in Mitchell County, Georgia.

- Juror 115:  Juror 115 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 115 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.

- Juror 116:  Juror 116 did not hear any juror state that they believed the Defendants to be guilty during the jury selection process or at any time before the jury began deliberating.  Juror 116 did not hear any juror state that the Defendants' actions caused deaths or that any juror conducted independent research.  Juror 116 reminded the Court, however, that Juror 116 informed the Court and the Parties during the jury selection phase that Juror 116 heard at a club in Blakely, Georgia, that people had died from the salmonella outbreak. Juror 116 stated that Juror 116 could set that knowledge aside and decide the case based solely on the evidence presented in Court.

(Doc. 349.)  The Defendants assert that the above-outlined proceedings implicate two constitutional protections enjoyed by criminal defendants: first, the right to a fair and impartial jury; second, the right to confront witnesses.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[; and] to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  This constitutional protection provides defendants with the right to trial by "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "Voir dire protects this right 'by exposing possible biases, both known and unknown, on the part of potential jurors.' "  *United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir. 1984) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

18

### i.   Whether Juror 35 harbored bias or intentionally failed to honestly answer a question during voir dire

The Defendants assert that Juror 35 harbored bias and concealed the same from the Court and the Defendants by failing to inform the Court that Juror 35 had knowledge of deaths being linked to the salmonella outbreak caused by the Defendants. Further, the Defendants assert that Juror 35 prejudged their guilt based on Juror 35's knowledge of those deaths. "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith*, 455 U.S. at 215; *Remmer v. United States*, 347 U.S. 227 (1954). To obtain a new trial where a juror gives an incorrect response during voir dire, the Defendants "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power*, 464 U.S. at 555. While the Court cannot consider whether a juror's bias had any influence on the jury's verdict, the Court can determine whether such bias was harbored by a juror and concealed from the parties and the Court. *See* Fed. R. Evid. 606.

The Court finds that the Defendants have failed to demonstrate that Juror 35 failed to honestly answer a material question during voir dire. While it is true that Juror 35 did not inform the Court that Juror 35 had knowledge concerning this case when so asked during voir dire, Juror 34 is the only juror who asserted that Juror 35—or any other juror selected to serve in this case—had knowledge of the facts of this case and willfully hid such knowledge from the Court. Juror 37 acknowledged that Juror 37 sat next to Juror 35 during jury selection and did not hear Juror 35 state that Juror 35 believed that the Defendants' actions caused deaths. Further, Juror 37 did not hear Juror 35 state during jury selection that Juror 35 had a belief as to the guilt or innocence of the Defendants prior to hearing evidence. Several other jurors stated that certain individuals in the jury venire had knowledge of the case and believed that the Defendants caused deaths. However, many venire members informed the Court of such knowledge and were stricken for cause. Many of the answers given by Juror 34 at the sealed October 24, 2014 hearing were vague and generalized without much more specificity than the information contained in Juror 34's affidavit. That affidavit was admittedly prepared by defense counsel and signed by Juror 34.

Throughout the sealed proceedings held on alleged juror misconduct, the Court only uncovered one juror who could be termed biased: Juror 34. Juror 34 stated that Juror 34 was emotional during a conversation with Wilkerson following the conclusion of this case and felt personally responsible for Wilkerson's conviction. The Court declines to assign any weight to Juror 34's testimony due to that Juror's expressed bias in favor of Wilkerson. Juror 34's testimony was generalized and contained no additional details beyond those contained in her affidavit. That affidavit was prepared by defense counsel and signed by Juror 34. Further, even if Juror 34 was not motivated by bias, it is possible that Juror 34 honestly believed Juror 35 stated that she believed the Defendants to be guilty when, in fact, another venire member made such a statement. That possibility is supported by Juror 35 and Juror 37's statement of the events. The testimony from all other jurors supports that finding and none of the removing jurors' testimony corroborated Juror 34's testimony.

Viewing the totality of the circumstances, the Court finds that there is no indication that any juror concealed harbored bias from the Court or the Defendants. Juror 35 stated that Juror 35 did not state during jury selection that Juror 35 believed the Defendants to be guilty because they caused deaths or for any other reason. Juror 37 corroborated Juror 35's referenced statement. Further, no other juror stated that Juror 35 asserted a belief that the Defendants were guilty for any reason during jury selection, or that any other person who was ultimately selected for jury service asserted such belief. For those reasons, the Court finds that the Defendants failed to demonstrate that any juror failed to honestly answer any question during voir dire.

### ii. Whether the jury was exposed to prejudicial extrinsic information

"A . . . new trial is required only if the extrinsic evidence known by the jury posed a reasonable possibility of prejudice to the defendant." *United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006) (citing *Perkins*, 748 F.2d at 1533). Once the Defendants meet their burden of demonstrating that the jury was exposed to extrinsic evidence, "prejudice is presumed and the burden shifts to the government to rebut the presumption." *Id.* (citing *Remmer*, 347 U.S. at 229). Other than Juror 34, only two jurors stated that deaths were discussed in the jury room. Juror 4 stated that discussion of deaths caused by salmonella did occur in the jury room but was unsure who engaged in that discussion. Juror 12 stated that Juror 35

mistakenly stated that the evidence showed that people were killed by the salmonella out-break but was immediately reminded by other jurors that the evidence did not demonstrate that people were killed; only that people were sickened.  Those Jurors' statements do not necessarily indicate that deaths caused by salmonella were discussed beyond Juror 35's mis-taken belief that the evidence showed such and the subsequent discussion clarifying that the evidence only demonstrated that people were sickened by the salmonella outbreak.  In other words, the Court finds that the discussion of deaths arose from a misperception or incorrect recollection of the trial testimony or evidence, not from an extrinsic source.  For that reason, the Court finds that the Defendants failed to demonstrate that the jury was exposed to ex-trinsic evidence.

In an abundance of caution, the Court will additionally consider whether the Gov-ernment rebutted the presumption of prejudice to the extent the Defendants met their bur-den of demonstrating that the jury was exposed to extrinsic evidence.  "To rebut the pre-sumption of prejudice, the government must show that the jurors' consideration of extrinsic evidence was harmless to the defendant." *Ronda*, 455 F.3d at 1299.  The Court must consid-er the totality of circumstances, including the nature of the extrinsic evidence, the manner in which such evidence reached the jury, and the strength of the Government's case.  *See id.* at 1300.

Even if the Defendants met their burden of demonstrating that the jury was exposed to extrinsic evidence, the Court finds that the Government has rebutted the presumption of prejudice.  All jurors except Juror 34 indicated that any limited conversation in the jury room regarding deaths caused by the Defendants was in passing.  Juror 34 stated that deaths were considered extensively but, for the reasons stated above, the Court lends little weight to Ju-ror 34's assertions due to Juror 34's admitted bias in favor of Wilkerson.  Although the De-fendants couch the testimony elicited during the sealed hearings as demonstrating that Juror 35 was forceful during the deliberations and insisted that the alleged deaths should be a driv-ing force in the jury's decision, Juror 37 specifically stated that Juror 35 was not permitted to take over the jury selection process.  Importantly, no juror other than Juror 34 indicated that the deaths were mentioned at any great length.[5]

---

[5] The Court considers this factor only to the extent permitted by *United States v. Ronda*, 455 F.3d 1273, 1299-1300 (11th Cir. 2006).

The evidence against the Defendants was overwhelming. The trial involved over six weeks of testimony and voluminous supporting documentation. Also, the jury's verdict indicated that the jury was thorough and contemplative. The jury deliberated over four days and returned numerous verdicts of not guilty. As discussed above, the jury apparently decided that the Government's evidence against Michael Parnell was insufficient to establish that he played an active role in introducing adulterated food into interstate commerce with the intent to defraud but that he did play such a role in introducing *misbranded* food into interstate commerce with the intent to defraud. Such a nuanced distinction would not likely have been reached by a jury acting under the influence of a biased juror.

Further, while evidence that white collar defendants caused deaths may be said to be "highly prejudicial" in many cases (*see* Doc. 350 at 14-15), the same cannot be said in the context of the evidence in this case. An expert witness testified at trial that salmonella can have devastating effects on human beings. Also, a victim of salmonella testified that she was hospitalized several times due to salmonella poisoning and experienced vomiting, diarrhea, fever, and fainting. The witness, who was elderly, went into significant detail about the symptoms of her ailment; specifically, she stated that some of her bowel movements consisted of only blood.

The Court also notes that defense counsel knew that several jurors had knowledge of the deaths but, because those jurors stated that they would be able to set that knowledge aside and decide the case based solely on the evidence, did not object to but accepted those persons serving on the jury. Reserving objection in such a situation serves as a tacit admission that knowledge of deaths standing alone does not necessarily render a juror incapable of making an unbiased determination of guilt. Lastly, the Court repeatedly reminded the jurors—beginning on the first day of trial and ending the last time the jury was sent into the jury room to deliberate, as well as every day in between—that they could only decide the case based on the evidence presented in Court. For all the reasons stated above, the Court finds that the Government has rebutted the presumption of prejudice caused by any exposure of extrinsic evidence to the jury as alleged.

The Court notes that statements by defense counsel, Kenneth Hodges, at the sealed hearings regarding inconsistent statements of particular jurors and the affidavit of a member of the media, Dallas Carter, have no bearing on the outcome of this case. The referenced

assertions were made by people without personal knowledge of the subject matter and consisted entirely of hearsay.  The Court directly interviewed all jurors involved in this case and finds no reason to discredit any person other than Juror 34 for the reasons stated above. Further, refraining from obtaining information from a member of the media avoids any potential problems regarding freedom of the press and reporter privilege.  As such, the Court need not and will not consider the referenced statements.

### D.        Cumulative Error

The Defendants assert that, even if no single alleged error is sufficient to warrant a judgment of acquittal or new trial, such relief is warranted when the above-referenced errors are considered cumulatively.  (Doc. 326 at 6-7.)  "The cumulative error doctrine 'provides that an aggregation of non-reversible errors . . . can yield a denial of a constitutional right to a fair trial, which calls for reversal.' "  *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)).  "The total effect of the errors on the trial will depend, among other things, on 'the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); the strength of the government's case,' and the length of trial."  *Id.* (citations omitted).  Where the Government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors.  *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

For the reasons stated above, the only potential errors that occurred in this case are comments by Prosecutor Hearn and the mention of deaths in the jury room.  The Court finds that those two potential errors are insufficient to warrant a new trial.  Most importantly, the evidence against the Defendants was overwhelming and, in many ways, straightforward.  The evidence showed that the Defendants sought to avoid testing peanut products for salmonella for financial reasons and lied to their customers and the FDA in an effort to conceal or continue their scheme.  Evidence was admitted that demonstrated the Defendants' extensive knowledge regarding their conspiracy and the dangers attendant thereto, and the unfortunate and unpleasant consequences that resulted therefrom.  For the reasons stated above, Hearn's comments to the jury and the mention of deaths were not effectively prejudicial standing alone or when considered together.

### III.   Wilkerson's Most Recent Motions

On April 2, 2015, Wilkerson filed an Amended Motion for Judgment of Acquittal. (Doc. 382.)  On April 3, 2015, Wilkerson filed a Motion to Dismiss the Indictment on Count 73 or, in the Alternative, Motion for a New Trial.  (Docs. 383 & 387.)  Together, the motions assert that Wilkerson was prejudiced by the Government's "data dump" of millions of documents that contained only "one to two thousand" relevant documents; that documentation relevant to the main witness against Wilkerson was "hid" within the "data dump" such that Wilkerson's *Brady* and *Giglio* rights were violated; and the Indictment was deficient.

First, the Court notes that the motions for new trial and judgment of acquittal are substantially late.  The Court gave the Defendants thirty days after the jury's verdict to file written motions for judgment of acquittal and ten days after the November 12, 2014 sealed hearing to file supplemental briefs to support the Defendants' respective motions for new trial.  *See also* Fed. R. Crim. P. 29 & 33.  April 2 and 3, 2015, are significantly past the referenced deadline.

Second, the Court finds that Wilkerson was not prejudiced by the Government's disclosure of voluminous documentation.  To establish violations of *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972), Wilkerson must cite to the particular evidence that the Government kept from her.  Here, Wilkerson freely admits that she was provided the needed evidence but claims that she was prevented from locating it.  The Court disagrees.  Throughout the course of this case, Wilkerson has moved for and was granted multiple continuances due to the volume of evidence produced by the Government.  Wilkerson was provided with software to comb through the evidence and the services of a computer technician to help use that software.  Her technician provided Wilkerson with 268 hours of technical services.  Because Wilkerson was granted multiple continuances and provided software and technical services to use such software, the Court cannot conclude that she was in any way prejudiced by the Government's production of voluminous discovery.  Lastly, as stated above, a motion to dismiss the Indictment should have been filed in a pretrial motion.  *See* Fed. R. Crim. P. 12(b)(3)(B).  Since it was not timely filed, the Court will deny that motion.

Therefore, Wilkerson's Amended Motion for Judgment of Acquittal (Doc. 382) and Motion to Dismiss Indictment on Count 73 or, in the Alternative, Motion for a New Trial

(Doc. 387) are **DENIED.** Further, Wilkerson's request to reserve the right to amend her motions until she receives the trial transcript, without any particularized reason in support thereof, is **DENIED.**

Lastly, on May 20, 2015, Wilkerson filed a Motion for Authorization for Payment. (Docs. 394 & 396.)  Therein, Wilkerson requests that the Court authorize payment of a forensic document analyst to analyze marks on pages of Gray's notes that are "extremely suspicious and indicative of residue of one or more words that may have been redacted off the page before production to the Defendant and submission into evidence and admitted as Government Exhibit #837." (Doc. 396 at 2-3.)  Even if Wilkerson was able to uncover new evidence, it is unclear which procedural mechanism she would use to urge the Court to consider such evidence.[6]  As noted above, the deadline for motion for new trial which are not founded on newly discovered evidence has long elapsed.  Gray's notes cannot be considered newly discovered evidence because Wilkerson had access to them long before trial and, as noted above, was given many different tools to properly access and examine those notes. Because new evidence discovered by Wilkerson's proposed expert would provide her with no possibility for relief at this stage of these proceedings, Wilkerson's Motion for Authorization for Payment (Doc. 396) is **DENIED.**

## CONCLUSION

For the reasons stated above, Defendant Stewart Parnell's Motion for Judgment of Acquittal, Motion for Dismissal or, in the Alternative, Motion for New Trial (Doc. 326), Defendant Michael Parnell's Motion for Judgment of Acquittal, as amended (Docs. 313 & 353), Defendant Mary Wilkerson's Motion for Judgment of Acquittal, as amended (Docs. 306, 325 & 382), Defendant Mary Wilkerson's Motion for New Trial (Docs. 339), Defendant Mary Wilkerson's Motion to Dismiss Indictment on Count 73 or, in the Alternative, Motion for a New Trial (Doc. 387), Defendant Mary Wilkerson's Motion for Authorization for Payment (Doc. 396), and the Defendants' Joint Motion for New Trial, as amended (Docs. 308, 319, 328, 350, 353 & 362) are **DENIED.**  Any objections to the draft presentence investigation reports (Docs. 355, 384 & 385) shall be submitted in writing within fourteen (14) days of the entry of this order.

---

[6] Unlike the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure do not provide a mechanism to set aside a judgment.  *See United States v. Mosavi*, 139 F.3d 1365, 1366 (11th Cir. 1998).

Further, the Clerk of Court is hereby **DIRECTED** to unseal all pleadings, orders, and transcripts previously filed under seal in this matter after redacting juror names and replacing such names with the respective jurors' identification number.  Counsel for the Government, Counsel for the Defendants, and the Defendants are **ORDERED** to not disclose the names of the jurors to any third party or to assist identifying or conferring the identify of any member of the jury on this case.  The Court's order directing jurors not to discuss this case remains in effect until this case is terminated by final appeal or the expiration of time period to file an appeal, if no Party appeals.  The purpose of these continued restrictions are to preserve the status quo for appellate review and any further proceeding which may result therefrom.

**SO ORDERED**, this  28th  day of May 2015.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**