IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : |
| | :   CASE NO.: 1:13-CR-12 (WLS) |
| STEWART PARNELL, | : |
| MICHAEL PARNELL, and | : |
| MARY WILKERSON, | : |
| | : |
| Defendants. | : |
| | : |

## ORDER

After an evidentiary hearing held on July 1 and 2, 2015, regarding relevant conduct for sentencing purposes, the Court set July 20, 2015 as the deadline for the Parties to file initial briefs on which relevant conduct should be considered as to each Defendant for sentencing purposes. On July 20, 2015, the Court granted the Government's motion to extend the relevant conduct briefing deadlines. (Doc. 431.) The response deadline expired on August 3, 2015. (*See id.*) Because the Parties were not permitted to file replies or surreplies, this matter is ripe for review.

The Parties do not dispute that Stewart and Michael Parnell's base offense level is 7 under U.S.S.G. § 2B1.1 based on their convictions for violations of 18 U.S.C. § 1343. Under U.S.S.G. §§ 2J1.2(c) and 2X3.1(a)(1), Wilkerson's obstruction conviction carries a base offense level that is six levels lower than the offense level for the underlying offense.[1] Therefore, the Court must determine the appropriate offense level increase for (1) the amount of losses under U.S.S.B. § 2B1.1(b)(1); (2) the number of victims under U.S.S.G. § 2B1.1(b)(2);

---

[1] Although Wilkerson stated that "[her count of conviction] was not related to any of the fraudulent activities and illnesses of the other Counts and Wilkerson was not a participant nor had knowledge of these events as no evidence linking her to any of these counts was ever presented," that assertion was overwhelmingly contradicted at trial. (Doc. 402 at 8-10.) Also, Wilkerson objected to the presentence investigation report's base offense level calculation because *United States v. Booker*, 543 U.S. 220 (2005), "did away with mandatory sentencing." (*Id.* at 9.) Although *Booker* made the guidelines advisory, that does not mean the USPO's calculation of the base offense level was incorrect. While Wilkerson is entitled to maintain her innocence forever, she was found guilty of one count by a jury, and the Court has since found that the evidence amply supports her conviction. Even after *Booker*, the Court is required to consider the United States Sentencing Guidelines and other sentencing goals. *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005) (quoting *United States v. Booker*, 543 U.S. 220, 259-60 (2005)).

1

(3) conscious or reckless disregard of death or serious bodily injury under U.S.S.G. § 2B1.1(a)(15); (4) role in the offense under U.S.S.G. 3B1.1; (5) acceptance of responsibility under U.S.S.G. § 3E1.1; and (6) obstruction of justice under U.S.S.G. § 3C1.1. Although the Defendants' relevant conduct arguments are addressed in separate briefs, the Court will address each argument as applied to each Defendant because many of the arguments contained in the Defendants' relevant conduct briefing are redundant of the other Defendants' arguments.

> I.  **Amount of Losses**

The Government has the burden of demonstrating the loss amount by a preponderance of the evidence. *United States v. Liss*, 265 F.3d 1220, 1230 (11th Cir. 2001). For purposes of the United States Sentencing Guidelines ("U.S.S.G."), the offense level adjustment based on the amount of loss caused by a defendant's criminal conduct is governed by U.S.S.G. § 2B1.1(b)(1). "Intended loss is the 'pecuniary harm that was intended to result from the offense,' and the actual loss is the 'reasonably foreseeable pecuniary harm that resulted from the offense.'" *United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010) (citing U.S.S.G. § 2B1.1, cmt. n.3(A)). "Pecuniary harm" means harm that is monetary or that otherwise is measurable in money. U.S.S.G. § 2B1.1, cmt. n.3(A)(iii). The loss amount for purposes of U.S.S.G. § 2B1.1 is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). Gain that resulted from the offense is used as an alternative means to calculate loss only if there is a loss but it reasonably cannot be determined. U.S.S.G. § 2B1.1, cmt. n.3(B).

The Government contends that Stewart Parnell and Mary Wilkerson should be held responsible for more than $100 million but less than $200 million in losses, and Michael Parnell should be held responsible for more than $20 million but less than $50 million in losses. The Government relies upon the testimony of FBI Special Agent Cynthia Allard presented at the evidentiary hearing on relevant conduct held on July 1 and 2, 2015. At that hearing, Allard presented a summary chart of the financial losses sustained by corporate victims. The Government tendered into evidence the business records provided by corporate victims to the Government pursuant to federal subpoenas.

As a preliminary matter, the Court rejects Stewart Parnell's assertion that the clear and convincing standard should be used in the relevant conduct determination in this case.

2

In the Eleventh Circuit, the preponderance of the evidence standard applies to relevant conduct determinations. *United States v. Rodriguez*, 751 F.3d 1244 (11th Cir. 2014). In the Ninth Circuit, the clear and convincing standard may be used where a sentencing factor has "an extremely disproportionate effect on the sentence relative to the offense of conviction." *United States v. Gonzalez*, 492 F.3d 1031, 1039 (9th Cir. 2007) (citation omitted). Although the Ninth Circuit uses a totality of the circumstances approach in determining whether to apply the clear and convincing standard in this context, that Circuit has found "that a nine-level enhancement . . . 'strongly supports application of the clear and convincing standard.'" *Id.* (quoting *United States v. Jordan*, 256 F.3d 922, 929 (9th Cir. 2001)). The Eleventh Circuit has not adopted any such rule, and this Court will not do so because it is bound by Eleventh Circuit precedent requiring courts to use the preponderance of the evidence standard in relevant conduct determinations. *See Rodriguez*, 751 F.3d 1244.

Stewart Parnell contends that Allard's testimony and the Government's evidence of the loss amount should be disregarded in its entirety because "[t]he government failed to present a single corporate victim that incurred a financial loss as a witness" and instead "sought and presented only summary 'evidence.'" (Doc. 433 at 2.) Stewart Parnell also asserts that the Government's subpoena of records intended to seek "summary submissions with no real substantiation." (*Id.* at 3.) Michael Parnell and Mary Wilkerson make substantially similar arguments. (*See* Docs. 432 at 3-4; 439 at 5-6.) The Court disagrees with the referenced characterization. The subpoena the Government used to acquire evidence of the loss amount stated the following:

> Instead of producing the documents requested by this subpoena, you may submit a comprehensive summary setting forth the requested information, provided that the [Business Records] Custodian is prepared to testify as to the accuracy and completeness of each such statement. The United States reserves the right to require the production of some or all of the underlying documents.

(*See* Doc. 425, Exh. 8.) While Stewart Parnell characterizes this statement as evincing "a purpose . . . to encourage summary submissions with no real substantiation," the Court believes the statement shows the Government's intent to determine the loss amount caused to the corporate victims in a timely and effective manner. Allard identified hundreds of potential victims, and the summary submissions option afforded to the corporate victims merely

3

allowed the victims to assist the Government in compiling the information. The corporate victims all remained under the threat of perjury and were not relieved of their duty to be prepared to "testify as to the accuracy and completeness of [their] statement[s of loss]." (*See id.*) Further, Allard testified that she contacted some of the corporate victims to verify or clarify information or calculations contained in the summary reports.

The Court notes its disagreement with Stewart Parnell's intimation that insurance offsets should be considered in this case. The fact that the victim corporations were reimbursed for some of their losses does not absolve any Defendant of his liability for the losses. First, the insurance companies who reimbursed the victim corporations suffered a loss of those payouts as a result of the Defendants' conduct and can therefore be considered victims under U.S.S.G. § 2B1.1. *See* U.S.S.G. § 2B1.1, cmt. n.1. Second, the Court is required to calculate the loss amount based on actual loss or intended loss, whichever is greater. *See United States v. Souffrant*, 517 F. App'x 803, 823 (11th Cir. 2013). The Eleventh Circuit has found that persons can be counted as victims even if they were fully reimbursed for their losses as long as the losses were "neither short-lived nor immediately covered by third parties." *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005). While *Lee* involved counting victims, not adding losses, it does support the notion that the loss suffered by the corporate victims themselves can be counted as losses even though the loss was later reimbursed because the loss was substantial, not all of the corporate loss was covered by insurance, and the insurance payout process was not immediate. In other words, the Court can count losses incurred by corporate victims, even where those victims were later reimbursed, or the Court can count losses incurred by insurance companies that had to payout on insurance claims as a result of the Defendants' offenses.[2]

Further, the Court disagrees with Stewart Parnell's assertion that the insurance payout under an insurance policy he purchased should be excluded. Stewart Parnell's offense conduct caused his insurance company to pay out over $12,000,000. That payout was indeed caused by Stewart Parnell's illegal conduct at issue in the above-captioned criminal action.

---

[2] The Parties have not indicated any concern with double counting. Therefore, the Court does not address whether the loss amount could include the amount lost by the corporate victims *and* the amount lost by the insurance companies in paying out claims to those corporate victims. There is no indication that such has occurred in this case. Additionally, the Court considered the corporate victims' losses without regard to insurer reimbursement, reducing further the risk of any possible double counting.

Also, the Court notes Stewart Parnell's assertion that he should only be held accountable for one-third of the losses because he had only one-third control over Peanut Corporation of America (PCA). This assertion might be relevant if the Court were calculating the loss amount based on the Defendants' gain, but since the Court finds that the loss amount can be reasonably calculated, the Defendants' gains are not considered. U.S.S.G. § 2B1.1, cmt. n.3(B). As such, the loss amount will be used for purposes of an offense level increase under U.S.S.G. § 2B1.1(b), and the Court will not consider the gain to Stewart Parnell.[3]

Stewart Parnell also argues that the Government's loss amount evidence should be disregarded because "Allard's testimony was confused and her methodologies were inconsistent throughout." (Doc. 433 at 12.) The Court need only make a reasonable estimate of the loss amount. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007). "A reasonable estimate of the loss amount is appropriate because 'often the amount of loss caused by fraud is difficult to determine accurately.'" *Id.* (quoting *United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir. 1999)). Although Stewart Parnell has identified arguable inconsistencies in Allard's intended methodology for determining loss and the calculations provided by some corporate victims, such as Kellogg (Doc. 433 at 12), Stewart Parnell's arguments do not undermine anywhere near the $44.6 million in losses he would have to call into question to qualify for a 24-level increase for more than $50 million but less than $100 million in losses as opposed to the 26-level increase recommended in the draft PSR. *See* U.S.S.G. § 2B1.1(b)(1). Further, the Defendants made no attempt to subpoena any corporate victims to inquire into the loss amounts at the evidentiary hearing. While the Government bears the burden of establishing the loss amount, the Defendants carried the risk that—without specific evidence of incidents of incorrect financial statements by corporate victims or actions by Allard that led to a calculation of loss amount that is improper under the U.S.S.G.—the Court would find the Government's method of establishing the loss amount satisfied the preponderance standard.

---

[3] To the extent Stewart Parnell argues that he should only be held accountable for one-third of *the loss amount*s because he was one-third owner of PCA, the Court rejects such argument. The other owners either engaged in the offense conduct as coconspirators or they did not. If they did, Stewart Parnell can be held accountable for their conduct under U.S.S.G. § 1B1.3(a)(1)(B). If they did not, Stewart Parnell is the only owner of PCA who engaged in the offense conduct and is the only owner of PCA who caused harm with his offenses. By explaining its analysis, the Court does not suggest that other owners were in any way involved in the charged conduct.

Michael Parnell advances substantially the same arguments advanced by Stewart Parnell. Michael Parnell, however, focuses on the fact that Kellogg provided only one summary chart of its losses and that Allard did not obtain and introduce evidence supporting documentation. (*See* Doc. 432 at 3-7.) While Michael Parnell's primary role in the conspiracy for which he was convicted involved fraud on Kellogg, he was indeed convicted of a broader conspiracy, to wit, conspiring with Stewart Parnell and others to manufacture certificates of analysis and falsely indicate to customers that peanut products tested negative for salmonella. Relevant conduct for sentencing purposes, however, includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). The Court finds that Stewart Parnell's conduct involving PCA clients other than Kellogg was reasonably foreseeable because Michael Parnell personally participated in other activities at the PCA facility in Blakely, Georgia, and should have known that the large-scale production of peanut products to be used in food manufacturing across the United States could have a profound effect, monetarily and otherwise.

The Court notes that the summary chart provided by Kellogg was accompanied by an email from the records custodian of that company that informed Allard that "someone from Kellogg [would] explain to you this spreadsheet." Further, Kellogg was intimately involved with settling claims filed by tort claimants in the bankruptcy proceeding described below because Kellogg obtained a large quantity of peanut products from PCA. Indeed, Michael Parnell's most important job in relation to his work with PCA was handling the Kellogg contract. As such, the Court believes that stating that the only evidence available to Allard or anyone else in the proceedings related to this case was a single spreadsheet from Kellogg is misleading. Thus, the Court finds that, considering the totality of the circumstances, the spreadsheet submitted by Kellogg is "reliable and specific" evidence of Kellogg's loss. *See United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011) (citation omitted).

Citing *Alleyne v. United States*, 133 S.Ct. 2151 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Michael Parnell also argues that his due process rights are implicated because the indictment did not intimate the large amount of loss that would be attributed to him. (Doc. 432 at 7-8.) Michael Parnell states that the policy rationale behind *Alleyne* is equally applicable to his case because "[t]he law historically 'allowed those who violated the law to know, *ex ante*, the contours of the penalty' affixed to the crime." (Doc. 432 at 7 (cit-

6

ing *Alleyne*, 133 S. Ct. at 2161).)  The referenced cases stand for the proposition that any fact that increases the statutory minimum or maximum term of confinement for a particular offense must be decided beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 490; *see also Alleyne*, 133 S. Ct. at 2162.  The Supreme Court has not suggested, however, "that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute."  *Apprendi*, 530 U.S. at 481 (emphasis in original).  Each of the crimes for which Michael Parnell was convicted carries a statutory maximum, and there is no indication by the Government that an attempt will be made to punish Michael Parnell in excess of that maximum.  *See* 18 U.S.C. §§ 1341, 1343; 21 U.S.C. §§ 331 & 333.

In sum, the Court finds that the financial business records provided by corporate victims pursuant to the above-mentioned federal subpoena contained sufficient indicia of reliability for Allard's reliance in her creation of the summary chart introduced at the July 1 and 2 evidentiary hearing.  While the Defendants assert some arguable inconsistencies or mistakes in her calculations, the Court's review of the referenced business records reveals that many of the corporate victims compiled and submitted comprehensive explanations of their losses and supporting documentation.  In consideration of the fact that the Government put the corporate victims on notice that they should be prepared to back up all assertions of loss with supporting documentation or face potential criminal penalties, the Court finds that the referenced business records supporting corporate victims' loss amounts are "reliable and specific evidence."  *See Bradley*, 644 F.3d at 1290.

For the reasons stated above, the Court finds that the Government has met its burden of establishing by a preponderance of the evidence[4] that Stewart Parnell and Mary Wilkerson[5] should be accountable under the Guidelines for more than $100 million but less

---

[4] Based on the volume and detail of the loss amount evidence presented at the evidentiary hearing and submitted into evidence, the Court also finds that the Government proved the loss amount with clear and convincing evidence.

[5] Wilkerson's arguments regarding loss were addressed by the Court in its discussion of Stewart and Michael Parnell's loss amount calculation, or were not specifically addressed, because the arguments attempted to ignore evidence presented at trial or were without a basis in the law.  For instance, Wilkerson objected to the loss amount because "the PSR's misrepresentation of the truth is highly prejudicial and sensationalizing to create a higher over-inflated sentencing range without justification and affect Wilkerson's substantial rights."  (*See* Doc 402 at 5.)  Also, Wilkerson stated that "[t]here were no actual boots on the ground during the financial investigation nor forensic audits performed and no provision of the tax records according to [Allard]."  (Doc. 439 at 5.)  For the reasons stated above, these observations are irrelevant.

than $200 million in losses, and Michael Parnell should be accountable under the Guidelines for more than $20 million but less than $50 million in losses.

## II. Number of Victims

The Government has the burden of demonstrating the number of victims by a preponderance of the evidence. *United States v. Liss*, 265 F.3d 1220, 1230 (11th Cir. 2001). The offense level adjustment based on the number of victims affected by a defendant's criminal conduct is governed by U.S.S.G. § 2B1.1(b)(2). A "victim" is any person, including individuals, companies, corporations, associations, firms, and partnerships who "sustained any part of the actual loss" or "who sustained bodily injury as a result of the offense." *See Rodriguez*, 751 F.3d at 1257 (citing U.S.S.G. § 2B1.1(b)(2), cmt. n.1). "Bodily injury [is] any significant injury; e.g. an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, cmt. n.2.

The Government contends that Stewart Parnell and Mary Wilkerson should be held responsible for 250 or more victims, and Michael Parnell should be held responsible for 50 or more victims. The Government relies upon the trial testimony of Dr. Ian Williams, Chief of the Outbreak Response and Prevention Branch at the Centers for Disease Control ("CDC"), and the testimony of Alan Maxwell presented at the evidentiary hearing on relevant conduct held on July 1 and 2, 2015. Maxwell was the claims administrator in PCA's bankruptcy proceedings. Williams testified at trial that the CDC found that "714 ill people reported to PulseNet from 46 states and included 166 persons who reported being hospitalized." (*See* Doc. 435 at 5.) To be included in that 714-person figure reported by the CDC, a person would have to have a stool sample taken by a healthcare provider, and the strain of salmonella found in that person's stool would have had to match the strain of salmonella linked to the PCA salmonella outbreak of 2007 using pulsed field gel electrophoresis. Williams also testified that the CDC estimated that there were thirty unreported cases of salmonella linked to the PCA outbreak for every one reported case due to the likelihood that individuals infected with salmonella would not go through the entire process of identifying the strain of salmonella explained above. According to Williams, when the recall of PCA products was complete, new cases of salmonella illness with patients presenting the particular strain of salmonella associated with the PCA outbreak ceased.

8

Maxwell was appointed by the United States Bankruptcy Court for the Western District of Virginia to serve as claims administrator for personal injury claims arising from the salmonella outbreak at the center of the above-captioned case. Maxwell was responsible for disbursing $12 million from a Hartford Insurance policy purchased by PCA. (Doc. 425-8 at 2.) To be eligible for compensation, a person had to submit proof that they had been infected with a particular strain of salmonella associated with the PCA outbreak after consuming food produced by PCA and exhibiting symptoms consistent with a salmonella infection. (*Id.* at 3.) Maxwell found that the total value of claims was approximately $15 million, and therefore reduced payouts to claimants to 79.00166% of the value assigned to the claim. (*Id.* at 4.) Wrongful death claims and claims submitted on behalf of minors were evaluated under the law of the state where the tort claim arose. (*Id.* at 7-8.) "Maxwell began with a verification of the medical expenses, days of total illness, hospital stays, Emergency Room visits, Doctor's Office visits, and incurred lost wages" and "created classes based on severity of the infection—which [was] determined by the course of treatment and the length of the illness." (*Id.* at 10.) At that stage, Maxwell assigned a rough valuation category after consulting a database of salmonella infection settlements from earlier outbreaks and considering "additional criteria such as the permanency of any effects, the age of the afflicted individual, and all incurred medical expenses." (*Id.*) Maxwell then adjusted claim valuations based chiefly on the strength of the causation evidence. (*Id.*) After Maxwell reached a rough valuation for each claim, he approached counsel for the tort claimants for collaboration. (*Id.* at 11.) Following discussion with the other attorneys, Maxwell finalized the claim amounts and those amounts were approved by the Bankruptcy Court. (*Id.*)

Stewart Parnell attempts to focus the Court's calculation of the number of victims on individuals who "sustained bodily harm" and suffered "a significant injury" with a nearly conclusive causal tie to the PCA salmonella outbreak. (Doc. 433 at 20-21.) This level of certainty is simply not required to determine relevant conduct. The Court must ensure that the Government met its burden of establishing that the number of victims the Defendants are being held accountable for harming is more likely than not the correct number. While Williams and Maxwell could not be certain beyond all doubt that the individuals they identified as victims were indeed harmed by PCA, it would be a mighty series of otherwise unexplained coincidences for so many people not to have been victims of the PCA salmonella outbreak

9

after eating PCA products, exhibiting signs of salmonella illness, and having in their body a specific and unique strain of salmonella conclusively linked to the PCA salmonella outbreak. For those reasons, the Court finds that Williams and Maxwell presented "reliable and specific evidence" of the number of victims in this case. *See Bradley*, 644 F.3d at 1290.

Michael Parnell argues that only one victim related to Kellogg was presented, presumably an elderly witness at trial who described her salmonella symptoms, including a bloody stool, after eating a Kellogg product containing peanut products with a lot number conclusively linked to the PCA Blakely facility. (*See* Doc. 432 at 9.) That argument, however, ignores the evidence presented by Williams and Maxwell, the reliability of which is discussed above. (*See also* Doc. 425, Exh. 8.) Further, the Court notes that Michael Parnell can be held responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See* U.S.S.G. § 1B1.3(a)(1)(B).

Wilkerson makes arguments substantially similar to Stewart and Michael Parnell's, but also goes to great lengths to discredit victim impact statements. (*See generally* Docs. 434, 439, 440, 444.) As should be evident from the evidentiary hearing on July 1 and 2, 2015, the Government's briefing on relevant conduct, Stewart and Michael Parnell's briefing on relevant conduct, and the Court's discussion above, the victim impact statements were not used to establish relevant conduct and are therefore irrelevant to the findings made in this Order.[6] Wilkerson also argues that Maxwell should not be trusted because he has a personal friendship with William Marler, "a civil attorney representing a large number of claimants against PCA and Kellogg, who may be the owner of Food Safety News, whom Mr. Maxwell recommended making large settlements to as a result of those claims." (Doc. 439 at 6.) The Court is charged with making credibility determinations for the purposes of relevant conduct, and the Court found no reason to discredit Maxwell's testimony.

For the reasons stated above, the Court finds that the Government has met its burden of establishing by a preponderance of the evidence that Stewart Parnell and Mary

---

[6] Wilkerson is accountable under the Sentencing Guidelines for the underlying offense conduct and "any specific offense characteristics that were known, or reasonably should have been known" by her, U.S.S.G. §§ 2J1.2(c), 2X3.1(a)(3)(A) cmt. n.1., but the calculation of Wilkerson's offense level under the Sentencing Guidelines and the determination of which, if any, individuals are victims of Wilkerson's crime as defined by the Crimes Victims' Rights Act are separate and distinct determinations. As the Court noted in its previous Order, the victim impact statements are not considered for relevant conduct purposes and will not be considered as to Wilkerson for Crime Victims' Rights Act purposes.

Wilkerson should be accountable under the Guidelines for harming more than 250 victims, and Michael Parnell should be accountable under the Guidelines for harming more than 50 victims.

### III.   Conscious or Reckless Risk of Death or Serious Bodily Injury

The United States Sentencing Guidelines provide for a two-level increase to a defendant's offense level if the offense involved "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(13)(A).  "Even if there is no evidence of death or serious bodily injury, the increase may nevertheless be appropriate, because the increase focuses on the defendant's disregard of risk, rather than on the result." *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015) (citing *United States v. Mateo*, 623 F.3d 1350, 1362 (11th Cir. 2010)).  The Government relies on trial testimony regarding Stewart and Michael Parnell's knowledge that peanut products produced at the PCA Blakely facility tested positive for salmonella and were shipped with certificates of analysis that stated that the products did not test positive for salmonella.

Stewart Parnell again asserts, as he has throughout the trial, that he did not and could not have known that his actions were dangerous because of the scientific belief at the time. In support of that assertion, Stewart Parnell has introduced a statement from a peanut broker that states that "it was a very common thought, pre 2008, if a product was roasted to meet a specified time and temperature kill step it was considered to be safe—regardless of what the tests revealed." (Doc. 433-4.)  In Stewart Parnell's brief, he includes a transcript excerpt from Al Maxwell, one of the Government's foodborne illness experts.  In that excerpt, Maxwell states that "heat was understood to kill bacteria certainly at the levels that Con-Agra or PCA was operating in terms of their kill step." (Doc. 433 at 23.)  Maxwell went on to say that "[i]f one assumes the kill step was the weak link allowing the Salmonella to persist," he would agree that the scientific knowledge regarding the steps necessary to prevent salmonella outbreaks has changed since the PCA salmonella outbreak.

No peanut broker testified that they would ship peanut products that tested positive for salmonella.  No one testified that they would store peanuts in a manner that exposed the peanuts to filth, including the outdoor elements, mold, and animal feces.  No one looked at the pictures of the conditions of PCA and testified that those conditions were an appropriate environment in which to store peanuts.  While Stewart Parnell again attempts to paint his

actions as reasonable in light of what was known at the time, he cannot escape his emails admitted as evidence at trial that demonstrated he knew peanut products contained salmonella and shipped those products anyway.

Further, Stewart Parnell states that "a common understanding at the time by a layperson was that a salmonella infection might cause minor gastrointestinal issues." (Doc. 433 at 24.) First, Stewart Parnell was not a layperson in the context of salmonella and peanut product manufacturing. Second, the fact that salmonella may cause only minor injuries avoids the reality that it was commonly understood by everyone in Stewart Parnell's industry that salmonella was dangerous and could kill people. A car crash can cause a minor injury or no injury at all. However, no one will reasonably claim that intentionally ramming a car into another person's car is not objectively dangerous because the car crash *could have* only caused a minor or no injury.[7]

Michael Parnell argues that his offense level should not be increased for conscious or reckless risk of serious bodily injury or death because "no direct link was established between the P.P. Sales paste deliveries and any adulterated Kellogg's product, as reflected in the jury's 'not guilty' verdicts with regard to the Michael Parnell counts for adulterated food." (Doc. 432 at 14.) While Michael Parnell was not convicted on counts related to adulterated food, he was convicted on counts related to misbranded food. Those counts involved fraudulent certificates of analysis that Michael Parnell created to lead peanut clients to believe that the peanuts they were purchasing were free of salmonella. Michael Parnell had knowledge that the certificates of analysis were false and, because the recipients of the peanuts would therefore believe that the peanuts were safe, had knowledge that salmonella-laced food could be provided to consumers for consumption. For the same reasons stated above, Michael Parnell knew or should have known that his actions presented a risk of serious bodily injury or death.

Accordingly, the Court finds that the Government met its burden of establishing by a preponderance of the evidence that Stewart and Michael Parnell's offenses involved the conscious or reckless risk of death or serious bodily injury.

---

[7] The Court notes that its findings regarding the conscious or reckless risk of death or serious bodily injury in Stewart Parnell's conduct also apply to Wilkerson since Wilkerson's offense level is calculated based on the offense level for the underlying offense, including "any specific offense characteristics that were known, or reasonably should have been known by the defendant." U.S.S.G. §§ 2J1.2(c), 2X3.1(a)(3)(A) cmt. n.1.

**IV.    Role in the Offense**

Offense level adjustments for role in the offense are governed by U.S.S.G. § 3B1.1. That Section provides as follows:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

In determining a defendant's role in the offense, the Court should consider, among other things, "the exercise of decision making authority, the nature of participation in the commission of the offense . . . the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.3.

The Government contends that Stewart Parnell should receive a four-level offense level increase because he was a leader or organizer, and Michael Parnell should receive a three-level offense level increase because he was a manager or supervisor. *See* U.S.S.G. § 3B1.1(a) & (b). Stewart Parnell's only mention of an objection to an increase in his offense level for his role in the offense is that he "maintains his innocence and did not act as an organizer or leader of any criminal activity." (Doc. 405 at 10.) Stewart Parnell was convicted of sixty-eight felony counts. As such, his assertion of his innocence is no longer a matter for this Court to consider. The testimony and emails introduced at trial demonstrate that Stewart Parnell was intimately involved with the production of peanut products at the PCA Blakely facility and directed the actions of every person at that facility. Further, the evidence at trial demonstrates that Stewart Parnell's criminal activity involved at least five participants and was extensive. As such, the Court finds that the Government has met its burden of establishing by a preponderance of the evidence that the leader or organizer adjustment is applicable to Stewart Parnell in this case.

13

Michael Parnell argues that he should not be held accountable as a manager or supervisor because he worked for P.P. Sales, a company completely separate from PCA. A person's title in their employment is not dispositive in the determination of the extent of the person's role in a criminal conspiracy. Michael Parnell's role in the criminal conspiracy was to ensure that PCA could continue to provide peanut products to Kellogg. Michael Parnell had control over all aspects of the Kellogg contract and was intimately involved with the PCA Blakely facility's production of peanuts to fill the Kellogg contract. Emails sent from Michael Parnell showed that he managed or supervised numerous people at the Blakely facility and he had and exercised the authority to control those person's actions. Further, the evidence at trial demonstrated that Michael Parnell's criminal activity involved at least five participants and was extensive.

Accordingly, the Court finds that the Government met its burden of proving that Stewart Parnell was an organizer or leader in the offenses at issue in the above-captioned case and that Michael Parnell was a manager or supervisor in the relevant offenses.

## V. Acceptance of Responsibility

Wilkerson objects to the draft PSR's indication that she is not entitled to an offense level reduction for acceptance of responsibility because she was entitled to maintain her innocence. (Doc. 402 at 8, 11.) The Court finds that Wilkerson is not entitled to a reduction for acceptance of responsibility. "[Eleventh Circuit] case law permits a district court to deny a defendant a reduction [for acceptance of responsibility] under [U.S.S.G.] § 3E1.1 based on conduct inconsistent with acceptance of responsibility, even when that conduct includes the assertion of a constitutional right." *United States v. Wright*, 133 F.3d 1412, 1414 (11th Cir. 1998). Acceptance of responsibility points present the "possibility of leniency"; withholding those points is therefore not "impermissible punishment." *United States v. Henry*, 883 F.2d 1010, 1011 (11th Cir. 1989). Wilkerson maintained her factual innocence throughout the trial and the relevant conduct proceedings in this matter. The jury convicted Wilkerson of obstruction of justice, and the Court has since found that the jury's verdict was supported by evidence introduced at trial. Further, Wilkerson has not acknowledged or accepted personal responsibility for the acts supporting her conviction. The Court finds that Wilkerson has not accepted responsibility.

## VI. Obstruction of Justice

Although he did not brief his objection to the obstruction of justice points under U.S.S.G. § 3C1.1 recommended in the draft PSR, Stewart Parnell previously objected to the application of the referenced relevant conduct points. (*See* Doc. 405 at 4, 10.) There is no dispute that Stewart Parnell was convicted of obstruction of justice in relation to the underlying offenses for which he was also convicted. The underlying offense, wire fraud, is used to calculate Stewart Parnell's base offense level. In such an instance, the offense level is increased by two points for obstruction of justice. *See* U.S.S.G. § 3C1.1. Accordingly, the Court finds that Stewart Parnell should receive two points under U.S.S.G. § 3C1.1 for obstruction of justice.

## VII. Conclusion

Based on the above, the Court finds that the PSRs' calculations of the Defendants' offense levels are correct under the United States Sentencing Guidelines. As such, Stewart Parnell's offense level is **47**, and Michael Parnell's offense level is **38**. Under U.S.S.G. § 2X3.1(a)(1), Mary Wilkerson's offense level is **30**.[8] Taking into account the statutory maximum terms for each of Stewart and Michael Parnell's counts of conviction and the fact that the terms for each count may be ordered to be served consecutively, Stewart Parnell's sentencing guideline range is 9,636 months imprisonment, and Michael Parnell's sentencing guideline range is 210 months to 262 months imprisonment. The statutory maximum term of confinement under 18 U.S.C. § 1505 caps Mary Wilkerson's term of imprisonment at 5 years, or 60 months. As such, Wilkerson's guideline range is 5 years imprisonment.

The only issues remaining in this matter are (1) the role the sentencing factors at 18 U.S.C. § 3553 should play in the Defendants' sentences, and specifically whether any Defendants' offense conduct falls outside the "heartland" of cases involving the conduct described in the guidelines, and (2) restitution. Although the Government asserted at the evidentiary hearing that restitution in this case may not be mandatory under an exception to the

---

[8] The offense level for Wilkerson's offense is capped by the U.S.S.G. at 30 but would otherwise be six levels lower than the base offense level for the underlying offenses. U.S.S.G. §§ 2J1.2(c); 2X3.1(a)(3)(A). In Wilkerson's case, the base offense level for Wire Fraud and Conspiracy to Introduce Adulterated and Misbranded Food into Interstate Commerce with Intent to Defraud is 7 with a 26-level increase for a loss amount over $100,000,000 but less than $200,000,000, a 6-level increase for 250 or more victims, and a 2-level increase for conscious or reckless risk of death or bodily injury, totaling 41. Reduced by 6 according to U.S.S.G. § 2X3.1(a)(1), Wilkerson's offense level would be 35 if it were not capped by the U.S.S.G. at 30.

15

Mandatory Victim's Restitution Act, the Government has since intimated that restitution is necessary.  (*See* Doc. 435 at 34-38.)  The Parties shall be prepared to address the matter of restitution at the sentencing hearing set for **Monday, September 21, 2015.**

**SO ORDERED**, this 18th day of September, 2015.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**
